RENDERED: JULY 1, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0167-MR

DAISY OLIVO $\qquad$ APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 17-CI-01256

LEGISLATIVE RESEARCH
COMMISSION $\qquad$ APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, JONES, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: Daisy Olivo ("Olivo") appeals from the Franklin Circuit
Court's grant of summary judgment to the Legislative Research Commission
("LRC") on her whistleblowing claim. She also appeals from the trial court's
allowance of certain legislators to intervene in the lawsuit. As the intervention
issue is moot, and Olivo failed to make a *prima facia* case that disclosures of
improper activity were contributing factors in a personnel action, we affirm.

**FACTS AND PROCEDURAL HISTORY**

In January 2016, Olivo was hired as a partisan communications staffer by Representative Jeff Hoover ("Hoover"), then the Minority Floor Leader of the Kentucky House of Representatives. In January 2017, as the Republican Party became the majority party, Hoover became Speaker of the House and Olivo was promoted to Communications Director for the Republican majority. Olivo admits that she was an at-will employee who served at the pleasure of the Speaker of the House, but she was on the payroll of the Legislative Research Commission.

As Communications Director, Olivo served as the primary media contact for the Speaker's office and also served Republican leadership and House members as directed. She also supervised staff members, including one known for purposes of this case as Jane Doe ("Doe").

Beginning in 2016, Olivo perceived the development of a flirtatious and unprofessional relationship between Hoover and Doe. She spoke with Doe about the situation. She reported her observations in 2016 to then Chief of Staff for Minority Leader Hoover, Brad Metcalf. In 2017, she made further reports to the Chief of Staff for then Speaker of the House Hoover, who was also her own supervisor, Ginger Wills ("Wills").[1] Though Olivo perceived the relationship

---

[1] Wills later married and changed her name to Ginger Kelly, but we will refer to her as Wills since that was her last name at the time of events leading to the Whistleblower lawsuit.

between Hoover and Doe to be inappropriate, she believed it was consensual based on her conversations with Doe at the time.

Doe took approved military leave for a few months during the spring and summer of 2017. In August 2017, Doe spoke with Olivo and told her that Doe's relationship with Hoover was not consensual. According to Olivo, Doe also alleged that Wills was hostile to Doe due to Doe's relationship with Hoover.

After returning from military leave in early October 2017, Doe expressed concerns to Olivo about alleged harassment. And on October 16, Doe told Olivo that she (Doe) had made a settlement demand on Hoover and other legislators. Doe showed Olivo her demand letter and text messages exchanged with Hoover.

On October 25, 2017, Doe and her counsel attended a mediation with Wills, Hoover, and other legislators where a settlement was reached. Olivo did not participate in the mediation. Olivo states that she first became aware that a settlement was reached when a reporter contacted the Speaker's office to ask for details about the settlement.

Apparently, the fact that a settlement had taken place quickly became a matter of public knowledge:

> While the mediation was ongoing, a reporter filed an
> Open Records Request seeking information about
> whether public resources had been involved in a
> harassment complaint against Speaker Hoover . . . .

> Shortly after the mediation, news of a settlement became public, though specific details were still unknown.

(Judgment, page 3.) The Chief Clerk of the House of Representatives contacted LRC to inquire about the settlement on October 26. On October 27, screenshots of text messages allegedly sent by Hoover were released via a Twitter account falsely represented to be Hoover's account. By November 1, "major media outlets were reporting that Speaker Hoover had entered into a confidential agreement related to sexual harassment allegations with an LRC staffer." (Judgment, pages 3-4.)

Meanwhile, Olivo and Doe had spoken on or about October 26. Olivo asserted that Doe relayed messages to her, warning Olivo to stop talking about the harassment or related matters and further warning that Hoover and Wills sought to fire Olivo. Also on October 26, in an email to Wills, Olivo expressed concern about Doe being harassed and feeling fearful of returning to work. Wills responded to the email saying that any employees should bring any concerns about harassment to her (Wills). Olivo perceived this as less than helpful since she believed Wills was involved in harassing those reporting alleged misconduct.

Around October 27, Olivo called the Executive Director of LRC to report that Hoover and Wills were covering up a confidential settlement for sexual harassment. Also, around this date, Olivo sent email correspondence to LRC officials (including general counsel and human resources director) to report sexual harassment and potential liability of LRC and Doe's fears of returning to work.

On November 1, 2017, Olivo met with the LRC human resources director and LRC general counsel for several hours. She disclosed information from Doe about the inappropriate relationship with Hoover and the confidential settlement and attempt to keep the settlement secret. She also reported that Wills was creating a hostile work environment for Doe.

On November 2, Olivo received an email from Wills advising Olivo, "Per conversation with Speaker, please direct all media inquiries for Speaker Hoover to Tommy Druen until further notice." (Record ("R."), p. 615.) According to Wills' deposition testimony, this was because Wills received a report on October 30 that Olivo had contacted the media seeking publication of stories about Hoover and the sexual harassment allegations. Olivo disputes this, contending this was retaliation for her disclosure to LRC officials – pointing to the timing of Wills' email coming just a day after her meeting with the LRC human resources director and general counsel.

On November 5, Hoover resigned as Speaker and Representative David Osborne became Acting Speaker. On November 7, 2017, a staffer for Osborne sent out an email stating, "Per conversation with Speaker Pro Tem Osborne, all media inquiries received will now be directed to Daisy Olivo until further notice." (R., p. 384.) Olivo, however, in her deposition alleged that although she continued to be paid, kept her benefits, and kept her title, she was

effectively not allowed to do anything and was ostracized from early November 2017 until her eventual termination a year later.

In December 2017, Olivo filed a lawsuit asserting claims under the Kentucky Whistleblower Act ("KWA") codified at Kentucky Revised Statute ("KRS") 61.101 *et seq.* Her complaint further set forth allegations that she met again with LRC's human resources director and general counsel in mid-November and reported that Wills continued to create a hostile work environment. She asserted that various legislators attempted to intimidate her, including one legislator surreptitiously photographing her and a co-worker. Her complaint also detailed her attempt to meet with the House budget director to discuss pending legislation and her perception that communications staff were being given no information and thus could not provide communications assistance to majority caucus members. And she asserted that the House budget director, Frank Willey, made disparaging comments about her.

Olivo alleged retaliation by Hoover and Wills by removing her job duties for reporting official misconduct. She requested relief including a jury trial, compensatory and punitive damages, and attorney's fees.

Sometime after the inception of the lawsuit and depositions taken, Hoover and other legislators filed a motion to intervene in this action to protect their reputations and cross-examine witnesses. The trial court allowed the

intervention. The intervening legislators sought to depose Doe, but they agreed to continue the deposition until after the November 2018 election. Ultimately, the intervenors never took the deposition.

David Osborne was formally elected the Speaker of the House in early November 2018. On or about November 30, 2018, Speaker Osborne replaced Olivo and she was terminated as Communications Director. Olivo successfully sought leave to amend her complaint to include allegations of additional retaliation including her termination. An agreed order was entered for the intervening legislators to be dismissed from the action in October 2019 – after LRC had filed a motion for summary judgment.

The trial court expressed concerns about separation of powers and ordered supplemental briefing on the issue. Ultimately, the trial court granted LRC's motion for summary judgment.

The trial court found, for purposes of the KWA, the following: that the LRC is a division of the state; that Olivo, as an employee of the LRC, was an employee of the state; and that Olivo had made a good faith disclosure of a suspected violation of state or local law to an appropriate body. But it further found that there was no evidence that the LRC had any knowledge or involvement in the re-assignment of Olivo's duties or the other retaliatory actions complained of by Olivo. Therefore, Olivo could not make a *prima facia* case for one of the

necessary elements required to show a violation of KRS 61.102. The trial court further determined that it would overstep its bounds under constitutional separation of powers provisions if it reviewed a Speaker's personnel decisions regarding high-level partisan staff who traditionally serve at the Speaker's pleasure.

Olivo filed a timely appeal from the summary judgment. She also challenges the trial court's allowing Hoover and other legislators to intervene in her lawsuit. Further facts will be set forth as needed.

## STANDARD OF REVIEW

Summary judgment is proper where no material issues of fact exist, and the moving party is entitled to judgment as a matter of law. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). On appeal, we review the trial court's grant of summary judgment under the non-deferential *de novo* standard, as the Kentucky Supreme Court has explained: "Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a de novo standard of review with no need to defer to the trial court's decision." *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (footnotes omitted).

At the outset, we would note that Olivo disputes some of the fact as set forth in the trial court's order regarding whether a temporary re-assignment of

-8-

some duties could not be characterized as retaliatory absent some penalization such as loss of pay or benefits or that actions taken directly by the Speaker of the House are not direct actions of the LRC. We also note, and are mindful that, when opposing summary judgment, the party must present "some affirmative evidence" that material facts are in dispute. *Steelvest*, 807 S.W.2d at 482. However, we are not persuaded that the trial court misunderstood or misconstrued the evidence and agree with the trial court that no genuine issue of fact exists.

**Kentucky Whistleblower Act and Other Relevant Statutes and Regulations**

KRS 61.102(1) appears to broadly prohibit employers from engaging in actions which "in any manner whatsoever" discriminate against or discourage employees who whistle-blow, *i.e.*, report or disclose actual or suspected illegal or unethical conduct or abuse of authority.[2] But KRS 61.103(3) requires that an

---

[2] KRS 61.102(1) states: "No employer shall subject to reprisal, or directly or indirectly use, or threaten to use, any official authority or influence, in any manner whatsoever, which tends to discourage, restrain, depress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the Kentucky Legislative Ethics Commission, the Attorney General, the Auditor of Public Accounts, the Executive Branch Ethics Commission, the General Assembly of the Commonwealth of Kentucky or any of its members or employees, the Legislative Research Commission or any of its committees, members or employees, the judiciary or any member or employee of the judiciary, any law enforcement agency or its employees, or any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety. No employer shall require any employee to give notice prior to making such a report, disclosure, or divulgence."

-9-

employee must prove that the disclosure was a contributing factor in a "personnel action"[3] to prevail on a civil action filed under KRS 61.103(2) for violation of KRS 61.102(1).

KRS 61.990, which includes provisions for penalties for violation of KRS 61.102,[4] similarly indicates that the focus of civil proceedings filed under KRS 61.103 for violations of the KWA is to address retaliatory personnel actions based on the specific relief available – such as reinstatement and back pay. *See* KRS 61.990(4) ("A court, in rendering a judgment in an action filed under KRS 61.102 and 61.103, shall order, as it considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, exemplary or punitive damages, or any combination thereof. A court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees.").

---

[3] KRS 61.103(3) states: "Employees filing court actions under the provisions of subsection (2) of this section shall show by a preponderance of evidence that the disclosure was a contributing factor in the personnel action. Once a prima facie case of reprisal has been established and disclosure determined to be a contributing factor to the personnel action, the burden of proof shall be on the agency to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action." KRS 61.103(2) provides in pertinent part for a right to file a civil action to obtain injunctive relief and/or punitive damages for violation of KRS 61.102(1).

[4] KRS 61.990(3) provides: "Any person who willfully violates the provisions of KRS 61.102(1) shall be guilty of a Class A misdemeanor." But to our knowledge, no criminal charges have been filed against anyone regarding Olivo's allegations.

-10-

Thus, under KRS 61.102 and KRS 61.103, in addition to proving other elements of a whistleblower claim,[5] a claimant must prove that his/her disclosure of improper activity was a contributing factor in a personnel action. *Davidson*, 152 S.W.3d at 251. This is an all or nothing test. Each factor must be fulfilled and the employee must also "prove by a preponderance of evidence that 'the disclosure was a contributing factor in the personnel action'" *Thornton v. Office of Fayette County Attorney*, 292 S.W.3d 324, 329 (Ky. App. 2009) (citations omitted).

Based on our review of the record and applicable law, Olivo has not established a genuine issue of material fact regarding her employer taking or threatening action to discourage disclosure or to discriminate against or punish her for a disclosure. Further, even if that were not the case, Olivo has not established a genuine issue of material fact as to whether any disclosure was a contributing factor in a **personnel** action even construing all evidence and reasonable inferences

---

[5] *Davidson* v. *Commonwealth, Dep't of Military Affairs*, 152 S.W.3d 247, 251 (Ky. App. 2004), states that a violation of KRS 61.102 requires four elements: 1) employer being a state officer, 2) employee being a state employee, 3) employee making or attempting to make a disclosure of actual or suspected illegal activity to a proper authority, and 4) employer taking or threatening action to discourage disclosure or to discriminate against or punish employee for the disclosure. *Id*. at 251. Additionally, even though the trial court properly assessed for summary judgment purposes the issues regarding these four elements, we also affirm on the alternate ground concerning the personnel action requirement of KRS 61.103(3). Furthermore, we express no opinion on the trial court's discussion of constitutional separation of powers provisions. Rather, consistent with precedent, we decline to reach constitutional issues not necessary for resolution since this case may be properly resolved on non-constitutional grounds. *See, e.g.*, *Baker v. Fletcher*, 204 S.W.3d 589, 597-98 (Ky. 2006); *Preston v. Clements*, 313 Ky. 479, 483, 232 S.W.2d 85, 88 (1950).

therefrom in her favor. *See Steelvest*, 807 S.W.2d at 480-83. Thus, we affirm the trial court's grant of summary judgment.

## ANALYSIS

The trial court found that Olivo presented evidence sufficient to go forward as to the first three elements necessary to bring an action under the KWA, as set out in *Davidson*. However, she failed to present proof necessary to support a *prima facia* case for the required fourth element.

Though acknowledged by Olivo that she was a partisan, at-will employee who served at the pleasure of the Speaker of the House, there has been no real dispute that she was an employee of the LRC, and therefore the state, for purposes of the KWA. But whether or not the information allegedly disclosed by Olivo was not already public information, and therefore not subject to the KWA, is sharply contested by the LRC. The LRC contends that Olivo made no protected disclosure because any reports she made were communicated after the information at issue was already made public.

In its order, the trial court discussed the qualifications necessary for a report to be a protected disclosure under the KWA, specifically citing the Supreme Court of Kentucky, where it held, "First, the 'disclosure' of information which is public information or otherwise already widely known within the organization cannot qualify as a whistleblower disclosure. The statute protects the

whistleblower who exposes information not generally known." *Harper v. University of Louisville*, 559 S.W. 3d 796, 802 (Ky. 2018). It is true, there were facts showing at least some public knowledge about the settlement prior to Olivo's disclosure. However, when all facts were considered, and all inferences therefrom taken in the light most favorable to Olivo, and presuming the truth of her allegations for purposes of the summary judgement motion, we cannot hold the trial court erred regarding the nature of Olivo's disclosure.

We also cannot hold that the trial court erred in finding that the facts were not sufficient to show a preponderance of the evidence that the protected disclosure was a contributing factor in a personnel action. Olivo has alleged that she was the object of retaliation in three ways: 1) the initial alleged removal of duties as a result of the November 2, 2017 email advising that all media inquiries regarding then-Speaker Hoover be directed to another employee rather than Olivo, 2) ostracism from legislators (and other employees) and lack of media inquiries to handle or other meaningful work to do for the approximately one-year period ending in late November 2018, and 3) her termination in late November 2018. However, with the exception of her eventual termination, none of these alleged forms of retaliation were personnel actions. Further, there is no evidence that the alleged retaliatory actions were taken by the LRC.

KRS 61.101 and KRS 61.103 provide definitions for other terms used in the KWA including *employee*, *employer*, *disclosure*, and *contributing factor*. But neither explicitly defines the term *personnel action* which is something a claimant must prove to prevail on a KWA claim under KRS 61.103(3). And we are unaware of any other more general statutory definition of *personnel action* such as those provided for other terms in KRS 446.010.

Nonetheless, it is abundantly clear from numerous other statutes and regulations that personnel actions under Kentucky law generally refer to actions affecting one's pay, benefits, or general employment status including job title and location. *See, e.g*., KRS 154A.080(1) (providing that Kentucky Lottery Corporation employees "shall be subject to suspension, dismissal, reduction in pay, demotion, transfer, or other personnel action at the discretion of the president" and that "[s]uch personnel actions shall be exempt from the provisions of KRS Chapter 18A."); 101 Kentucky Administrative Regulations ("KAR") 1:335 (establishing Personnel Board rules about Employee Actions including demotion, transfer, and reinstatement but providing in Section 5(3)(d) that after a written reprimand is removed from a personnel file, the removed reprimand may not be considered in a "personnel action"); 780 KAR 6:070 (requiring use of Personnel Cabinet forms for "personnel actions" which includes information regarding leave balances, title, salary, transfers, and other status changes).

Although we are unaware of any controlling case law defining a personnel action for KWA purposes, we implicitly expressed doubt that a threat to file a Kentucky Rules of Civil Procedure ("CR") 11 challenge to a lawsuit came within the general understanding of a personnel action for purposes of the KWA. *See Davidson*, 152 S.W.3d at 253 (although not explicitly rejecting plaintiff's argument that a threat "to file CR 11 sanctions" was a personnel action, stating that "[e]ven if this were true," plaintiff failed to specifically plead threatened CR 11 sanctions as a retaliatory personnel action in his complaint.).

Here, Olivo has alleged retaliation from November 2017 through November 2018 in the form of ostracism from legislators and other staffers and through being given no media inquiries to handle or other meaningful work to do.[6] Although we certainly do not condone or encourage ostracism in the workplace nor the practice of keeping workers on the public payroll without assigning them any duties to benefit the Commonwealth, Olivo's allegedly being ostracized and assigned only minor duties for about a year simply does not amount to any personnel action. Nor does Speaker Hoover's request that another employee

---

[6] We are certainly aware that LRC claims that Hoover's request to have someone else handle his media inquiries was a reasonable reaction to his hearing allegations that Olivo was "shopping stories" about him and that Olivo argues this request coming just one day after her meeting with the LRC human resources director and general counsel indicates that her making disclosures to these LRC officials prompted Hoover's request. Nonetheless, regardless of the motivation behind Hoover's request, it was not a personnel action affecting pay, benefits, job title, location, or general employment status.

handle his media inquiries for the last few days he remained Speaker in November 2017.[7]  None of these actions, whatever their motivations or merits, would have tangibly affected Olivo's pay, benefits, title,[8] or general employment status so they could not qualify as the sort of personnel action which Olivo must prove under KRS 61.103(3).

On the other hand, Olivo's eventual termination after Speaker Osborne formally took office in November 2018 is clearly a personnel action affecting her pay, benefits, title, and general employment status.  But Olivo fails to point to any affirmative evidence that her late 2017 disclosures were contributing factors to her being terminated upon Osborne taking office and selecting his own staff.  *See* KRS 61.103(3).  She admitted in her deposition that she served at the

---

[7] We are aware of evidence in the record that Olivo received an email – apparently from someone else in a position akin to that formally filled by Wills while Hoover served as Speaker of the House – which purportedly restored Olivo to her usual duties on November 7, 2017.  But regardless of whether this email officially restored Olivo to her usual duties, we conclude that neither Hoover's request for someone else to handle his media inquiries during his last days as Speaker nor any lack of requests for Olivo's assistance from other legislators thereafter constituted a personnel action.

[8] We are aware that Olivo claims in her brief that the November 7 email "reinstated her, in title only, to Communications Director."  (Appellant's brief, p. 6.)  But having examined the email in the record, there was no discussion of job title therein, but a simple statement that pursuant to Osborne's direction, all media inquiries be directed to Olivo until further notice.  And the parties have not directed our attention to anything in the written record which indicates that Olivo's job title was ever formally changed between November 2017 and her November 2018 termination.  (The November 2, 2017 email from Wills did not explicitly discuss Olivo's job title either, but simply advised that Hoover's media inquiries would be handled by someone else until further notice.)

-16-

pleasure of the Speaker and that often those taking office would replace partisan staffers under the former regime with their own staff. *See also* 101 KAR 3:050 Section 1(3) (providing that unclassified employees "shall serve at the will of the appointing authority and shall be subject to termination without prior notice or cause.").

Though the specific source of such authority (other than 101 KAR 3:050 Section 1(3)) may be hard to pinpoint,[9] a constitutional officer such as the Speaker of the House is generally understood to have the power to select his/her own unclassified staff and to be under no obligation to retain the unclassified staff of his/her predecessor. *See Martin v. Corrections Cabinet*, 822 S.W.2d 858, 862 (Ky. 1991) (Reynolds, J., dissenting) (citation omitted) ("Political realities should, at a minimum, afford an administration, new or old, an opportunity to appoint persons in tune with current political philosophies. Political considerations have always weighed heavily in personnel appointments."). Given the new Speaker's apparent authority to select his own staff and the lack of affirmative evidence that

---

[9] Though the trial court indicated in its summary judgment order that Speaker Osborne had a constitutional right to select his own staff upon formally taking office, the trial court did not identify any specific provision in the Kentucky or United States Constitution to this effect. Nor are we aware of any specific statute or constitutional provision to this effect.

Olivo's 2017 disclosures were a contributing factor to Olivo being terminated upon the new Speaker's election,[10] summary judgment was appropriate.

In short, Olivo has failed to establish a genuine issue of material fact regarding whether her late 2017 disclosures were contributing factors to her late 2018 termination, and it appears impossible for her to prevail on a KWA claim on her termination even construing the record in the light most favorable to her, so LRC is entitled to judgment as a matter of law regarding her termination. CR 56.03; *Steelvest*, 807 S.W.2d at 480-83. The trial court reached the correct result in granting summary judgment for LRC against Olivo.

**Intervention Issue is Moot so we Decline to Address Its Merits**

Olivo indicated her disagreement with the trial court's allowing legislators, including Hoover, to intervene in her lawsuit in her list of issues on appeal in her prehearing statement. But because Olivo did not name the intervenors as appellees in her notice of appeal, this Court issued an order for her to show cause why this Court should not dismiss that part of her appeal dealing with intervention for failure to name necessary parties.

Olivo filed a response to the show cause order, explaining that she omitted the legislators from the notice of appeal based on her view that they had no

---

[10] The LRC points out in its brief that Olivo did not even allege, much less come forward with affirmative evidence that Osborne had actual or constructive knowledge of her 2017 disclosures before her termination. Olivo did not respond to this specific assertion in her reply brief.

standing as parties to the appeal. She also asserted that their interests were being protected by LRC and noted that they had been voluntarily dismissed from the case with prejudice by agreed order. A majority of this panel voted to allow Olivo to address the intervention issue in her brief. But we also ordered the parties to address whether Olivo waived any error by entering into the agreed order dismissing the intervening legislators and whether the agreed order of dismissal made the issue moot. (Order dated May 20, 2020.)

We will accept *arguendo* that Olivo did not waive any error or fail to preserve the intervention issue since she objected to intervention despite ultimately agreeing to the intervenors' dismissal from the case. But we need not reach the merits of the intervention ruling because the issue is simply moot contrary to Olivo's arguments.

Olivo argues "for a case to be moot, the circumstances of the case must change." And she quotes *Newkirk v. Commonwealth*, 505 S.W.3d 770, 774-75 (Ky. 2016) (citing *Commonwealth v. Terrell*, 464 S.W.3d 495, 498-99 (Ky. 2015)): "A case becomes moot as a result of a change in circumstances which vitiates the underlying vitality of the action." She argues that the circumstances of the case did not change and so the issue is not moot.

But Olivo fails to recognize that the circumstances of the case did change when the intervenors went from being parties able to participate in the case

to not being parties and not being able to participate in the case upon their agreed dismissal. As LRC points out in its appellee brief, all parties entered into the agreed order of dismissal and the trial court granted summary judgment to LRC only after the intervenors were dismissed by agreement. And LRC argues that the intervention issue is rendered moot because the intervenors are simply no longer in the case. We note that Olivo's reply brief does not respond to the LRC's argument on this issue.

We agree with the LRC that because the intervenors are no longer parties to the case, the issue simply does not amount to a **present** controversy for this Court to resolve. *See Cabinet for Health and Family Services v. Courier-Journal, Inc.*, 493 S.W.3d 375, 382 (Ky. App. 2016) (internal quotation marks and citations omitted) ("[A]n appellate court is generally without jurisdiction to reach the merits where no present, ongoing controversy or case in controversy exists as the court is unable to grant meaningful relief to either party.").

Furthermore, even assuming *arguendo* that the trial court erred in allowing intervention, Olivo does not clearly identify how she suffered any prejudice as a result – especially since the intervenors ultimately did not depose the staffer. Instead, she generally asserts that permitting a party other than those necessary for the litigation to intervene in a case and interfering with depositions creates an improper burden. As she cannot specifically identify how her

-20-

substantial rights were violated by the trial court's handling of this issue before the agreed order of dismissal was entered, we must conclude that any error would have been harmless. *See* CR 61.01 (no relief should be given from rulings which do not affect the parties' substantial rights and which are not inconsistent with substantial justice).

Despite Olivo's argument that reversal and remand is necessary to insure there is not future improper intervention, we are not authorized to provide advisory opinions. *Newkirk*, 505 S.W.3d at 774. Nor must we conclude, *sua sponte*, that this case presents a cognizable exception to our general prohibition against ruling on moot issues. *See generally Morgan v. Getter*, 441 S.W.3d 94, 101-02 (Ky. 2014) (discussing recognized exceptions to prohibition against reviewing moot issues). Olivo does not argue that any such recognized exception to the prohibition against reviewing moot issues exists and we are not obligated to research and construct arguments not raised by the parties. *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005) (citing *e.g.*, CR 76.12(4)(c)(v)). In short, we decline to address the merits of the trial court's ruling on intervention since the issue is moot.

Further arguments in the parties' briefs which are not discussed herein have been determined to lack merit or relevancy to our resolving this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's grant of summary judgment.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Shane C. Sidebottom
Covington, Kentucky

Hans G. Poppe
Louisville, Kentucky

BRIEF FOR APPELLEE:

Paul C. Harnice
James D. Allen
Sarah J. Bishop
Frankfort, Kentucky